IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

THOMAS PAUL LANDERS,
*PLAINTIFF*

V.

Case No. 1:16-cv-1153-SS

BRENT STROMAN, MANUEL
CHAVEZ, ABELINO REYNA and
JOHN DOE,
*DEFENDANTS*

**PLAINTIFF'S ORIGINAL COMPLAINT**
**& JURY DEMAND**

**Introduction**

This civil action arises from Defendants' violations of Plaintiff's civil rights on or about May 17, 2015, in Waco, Texas. This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and the United States Constitution. This is a civil rights action challenging as unconstitutional the above named Defendants' decision to engage in mass arrests, without particularized facts to establish probable cause. Plaintiff Thomas Paul Landers (hereinafter "Landers") seeks damages from Defendants Brent Stroman, Manuel Chavez, and Abelino Reyna, as well as an unidentified person, in their individual capacities as they acted under color of law, for depriving Landers of his First, Fourth, and Fourteenth Amendment rights under the United States Constitution.

1

**Jurisdiction and Venue**

1.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, and §1343.  Also, the supplemental jurisdiction of this Court to hear claims arising under any possible state law is invoked pursuant to 28 U.S.C. §1367.  Venue in this Court is appropriate under 28 U.S.C. §1391(b).

**Plaintiff**

2.      Plaintiff Thomas Paul Landers is an adult resident of Williamson County, Texas.

**Defendants**

3.      Defendant Brent Stroman (hereinafter "Stroman") is the Chief of Police for the Waco Police Department and is sued in his individual capacity.  He acted under color of law.

4.      Defendant Manuel Chavez (hereinafter "Chavez") is a detective employed by the Waco Police Department.  He acted under color of law and is sued in his individual capacity.

5.      Defendant Abelino Reyna (hereinafter "Reyna") is the elected District Attorney for McLennan County, Texas and is sued in his individual capacity.  He acted under color of law.

6.      Defendant "John Doe" is an unidentified employee of the Texas Department of Public Safety (hereinafter "DPS").

**Statement of Facts**

*Thomas Paul Landers was arrested for mere presence at Twin Peaks, May 17, 2015.*

7.     Thomas Paul Landers is a 60-year-old native Texan, husband, father, grandfather, lobbyist, and motorcycle enthusiast.  In the early part of his career, Landers was an executive chef and then restaurant owner.  By May 17, 2015, Landers was employed by a Fortune 500 Company as a Senior Territory Produce Consultant, managing a multi-million-dollar account for the corporation.  He was terminated from that position on May 22, 2015, during his incarceration for being present at Twin Peaks in Waco, Texas.

8.     Beyond career, Landers has been a motorcycle rights lobbyist for over a decade, authoring and advocating for bills related to the rights and safety of motorcyclists.  Landers was the Chairman of the Legislative Task Force for the National Coalition of Motorcyclists.  He has spearheaded bills in the Texas Legislature ranging from anti-profiling bills, bills that allocate funds for safety signs on freeways ("share the road"), and other proposed legislation.  To that end, he is a frequent visitor of Texas Senators like Kirk Watson, and has testified in committee at the Legislature on more than one occasion.

9.     On May 17, 2015, the Texas Coalition of Clubs and Independents (hereinafter "TCOC&I") was set to gather at a restaurant called Twin Peaks in Waco, Texas for a legislative update.  The TCOC&I is a politically active coalition of motorcycle clubs that includes Christian Clubs, Military Veterans clubs, Clean and Sober clubs, Women Only clubs, Child Abuse Assistance clubs, sport riding clubs, "Mom and Pop" clubs, independent riders, and others.  The TCOC&I meetings occur frequently throughout the year, always without incident.  They always begin with a prayer from a

3

chaplain, proceed with a few speakers who update attendees on pending bills that affect motorcycle rights and safety, and sometimes urge attendees to contact their legislators in support or opposition of pending legislation.  After the speakers, the attendees socialize, eat, and leave.

10.     Over the years, there has never been violence at a TCOC&I meeting.  Law enforcement, however, believed that there could be a problem at this particular meeting between some members of the Bandidos Motorcycle Club and some members of the Cossacks Motorcycle Club.

11.     Law enforcement informed the manager of the Twin Peaks restaurant that there might be problems at the scheduled TCOC&I meeting, a few days before the meeting.  Law enforcement, however, did not attempt to contact the speakers or organizers of the meeting to warn them of any possible problem.

12.     On the day of the meeting, DPS arrived at approximately 10:30 a.m. before any TCOC&I meeting attendees, and indeed before the restaurant opened, to observe and set-up cameras.  Those cameras, combined with surveillance video from business security cameras, filmed a violent conflict between a fraction of the attendees.

13.     With the eruption of violence at approximately noon on May 17th, the fight-or-flight response set in, and the vast majority of the attendees *flew* and took cover.

14.     At the close of the violence, nine people were dead and approximately twenty people were injured.  Many of those who ran and/or took cover from the violence were thrice victimized: First, they were placed in imminent fear of death, then they were subject to an unprecedented unconstitutional mass arrest, and then were indicted by a tainted grand jury proceeding.

15.     Landers specifically did not engage in any illegal conduct at Twin Peaks on May 17th, nor did

4

he encourage anyone else to engage in any criminal conduct.  Instead, Landers was present to speak to the attendees about pending legislation, and when the violence erupted, he took cover and tried to stay alive.  Landers, nevertheless, was one of the 177 people arrested.

*Law enforcement planned to release most of the attendees.*

16.     Twin Peaks should now be the dictionary example of "wrong place at the wrong time."  An unknown number of people were present at Twin Peaks when the violence erupted, and a large number of unknown people *simply left* before law enforcement had 'secured the scene.'

17.     After the scene was 'secured,' some law enforcement officers allowed new people to enter the scene who had not been present for the violence, while other officers refused admittance to newcomers.

18.     Many of those present at the end of the violence wore vests and t-shirts that included patches, words, and colors.  Some of those vests indicated to observers that the wearer was a Christian.  Other vests indicated to observers that the wearer was a patriotic military veteran.  Still other vests indicated to observers that the wearer was in a woman-only motorcycle club, or in a Clean and Sober club.

19.     Landers's vest indicated that he was associated with the Escondidos MC, LLC, registered with the State of Texas, which is a lobbyist club.  Landers has co-authored and spearheaded many Senate and House Bills through the Texas Legislature, including an anti-profiling bill with Senator Kirk Watson.  Landers has frequently testified in committee at the Texas Legislature.

20.     At first, those present at Twin Peaks were simply held in place at Twin Peaks until law enforcement could sort out what had happened.  Eventually, later in the afternoon of May 17th, they

were transported by bus to a local convention center so that they could be interviewed as witnesses.

21.     The Waco Police Department Assistant Chief Lanning (who was Acting Chief on May 17th) planned to release anyone not involved in the violence so long as they did not have outstanding warrants.  In fact, that plan was implemented and some people were released to go home.

22.     After some attendees had already been released, this rational conclusion to a day of tragedy was derailed and Defendants decided to take a course of action that would result in the arbitrary and unconstitutional arrests of people who were actually victims, including Landers.

*Reyna put a stop to the existing plan and redirected law enforcement's investigation.*

23.     According to law enforcement, Reyna derailed the rational plan to release the innocent when he showed up to the Twin Peaks scene and decided that he wanted every person arrested who associated with the Bandidos Motorcycle Club, the Cossack Motorcycle Club, and indeed anyone wearing colors *similar* to the Bandidos or Cossacks.  Reyna and his agents stopped the witness interviews, indicating that everyone would be arrested.

24.     While law enforcement on the scene focused on a Capital Murder investigation, Reyna changed the direction of the investigation and instructed law enforcement to investigate TCOC&I attendees for motorcycle club affiliation.  He and his agents instructed law enforcement to interrogate people for their club affiliation, and investigate their clothing for any colors that were similar to the Bandido Motorcycle Club and Cossack Motorcycle Club.

25.     Law enforcement's focus on Who-Did-What changed to Who-Is-Wearing-What, at Reyna's direction.  All of the assistant chiefs on site, as well as a sergeant, disagreed with the decision to engage in the mass arrest, but went along with the mass arrests because Defendant Chief Brent

Stroman acceded to the plan.  Assistant Chief Lanning was in charge in Stroman's absence.  Chief Lanning, however, had not arrived at the Convention Center when Reyna began drafting the affidavit for the general warrant that would be used for the mass arrests.

*Stroman acceded to Reyna's advocacy to arrest everyone, despite his AC's disapproval.*

26.     Waco Police Department Stroman was not physically present at the scene, but was in communication with his assistant chiefs and with Reyna.  His initial understanding of events was that several people had been shot, and he learned more through a variety of different law enforcement agencies by phone.

27.     Stroman received a phone call from Assistant Chief Lanning later in the day of May 17th and was told that Reyna was on the scene and he was "advocating" for everyone to be arrested.

28.     According to Reyna's sworn testimony, it was Stroman who derailed the rational plan to release those innocent people who were merely present at Twin Peaks.

29.     According to Reyna, Stroman made the call to arrest everyone wearing even similar colors to Bandidos Motorcycle Club colors or Cossack Motorcycle Club colors.  According to Stroman, Reyna informed him that there was probable cause for the mass arrests, and based on that assurance, Stroman made the decision to arrest everyone that wore similar colors.  Stroman agreed to the mass arrests **without knowing what crime the attendees would be charged**.

*Chavez signed arrest affidavits that included facts he could not confirm.*

30.     Defendant Chavez was the on-call investigator for Waco Police Department on May 17th, and he was assigned to execute probable cause affidavits the next day on the 18th.  Those affidavits – all 177 of them – were identical with the exception of the arrestee's name.

31.     DPS investigators from the Austin Division of DPS provided some information to the Defendants.

32.     The affidavits included a statement that the arrestee was a member of a criminal street gang. That statement was false for most of the arrestees.  Chavez had no personal knowledge about anything stated in the affidavit, nor did he indicate in the affidavit where the factual basis was coming from, if not himself.

33.     In Landers's own probable cause affidavit, there is a statement indicating that he is a member of a criminal street gang.  Landers is NOT a member of any criminal street gang; and, in fact, his club is a legally registered limited liability corporation.  Chavez had no factual basis to believe or conclude criminal street gang-membership for Landers.  The statement was an unfounded conclusion drafted by Reyna's agent and not based on any actual investigation.

34.     The affidavit also included a defamatory statement that Landers, **who held a CHL**, associates in the commission of criminal activities.  The statement was false, unfounded, and not the product of any actual investigation.  Further, given Landers's CHL status, a short investigation would have demonstrated that Landers was the opposite of a 'criminal,' but instead had been deemed by DPS to be worthy of a CHL!  Chavez did not know from where the statement originated or why it was included in the affidavit.  Chavez swore to the truth of false information without knowing the source of the information.

35.     Reyna has testified that he personally told Chavez to read the probable cause affidavit and call people to ask questions if he was unsure of anything in the affidavit.  Chavez denies that he ever spoke with Reyna at all about the affidavit.  Chavez has testified that he had no input into the

8

contents of the affidavit.  Chavez has admitted that he signed the affidavit even though he did not know whether the contents were true or false.

36.     In contrast to the What-Are-They-Wearing question posed by Reyna, the actual real investigation yielded a great deal of exculpatory fruit *on May 17th before the arrests*.  Law enforcement learned during interviews that the vast majority of TCOC&I attendees were present for a normal meeting, expecting a legislative update <u>from Landers</u> about national legal issues affecting motorcyclists.  (For example, the 30th Annual National Coalition of Motorcyclists Convention had concluded shortly before May 17th, and a significant federal lawsuit affecting motorcycle club trademark infringement was addressed.  Landers planned to update the TCOC&I attendees on the status of that trademark lawsuit.)

37.     These witness interviews, and the video evidence available to law enforcement at the time of the arrests, demonstrated that most of the attendees, regardless of the colors of their clothing, were not involved in the violence.

38.     Specifically, Landers did not slap, hit, kick, or encourage anyone else to harm anyone at Twin Peaks, like most of the innocent people there for the TCOC&I meeting.  The objective video evidence, also available at the time of arrest, demonstrated that most people were shocked and surprised by the outbreak of violence.  When fight-or-flight set in, most flew.

39.     Law enforcement knew that people were there for the TCOC&I meeting and most were surprised by the violence before the witness interviews stopped at approximately 8:30 p.m. on May 17th when Reyna called a meeting to redirect law enforcement's focus from Who-Did-What to What-Are-They-Wearing.  Defendants and others met and together decided to charge everyone even

similarly dressed with the offense of Engaging in Organized Criminal Activity.

*Law enforcement did not believe they had probable cause for mass arrests.*

40.     Defendant Stroman has publicly acknowledged he is responsible for the mass arrests.  Law enforcement has confirmed Defendant Reyna's role in directing the course of the investigation and deciding who to arrest.  Specifically, Assistant Chief Lanning testified in a disqualification hearing: "I told Mr. Reyna that if the decision was mine, we were not going to make the arrests."

41.     Objectively, before the decision to arrest everyone was made, law enforcement knew that there was a TCOC&I meeting scheduled at Twin Peaks, and the vast majority of people there were simply there for the meeting.  They knew based on objective video evidence that the violence was a surprise and most of the attendees did nothing to further the violence.

42.     Also based on that objective video evidence, they knew that Landers was not part of the violence at Twin Peaks, as he was on a different side of the building at the time of the conflagration.

43.     Notably, after the mass arrests, whenever a motorcyclist who was not arrested because he/she wore a sufficiently different color than Bandidos or Cossacks contacted law enforcement for a return of property, law enforcement looked to the video.  Law enforcement officers would review the video, note where the particular person was and what they were doing.

44.     An offense report supplement describes one such person who took cover, but drew a gun to protect himself.  Law enforcement concluded that the person (a member of a Clean and Sober club who was physically closer to the violence than Landers) was <u>not involved</u>, and agreed to return the person's property.  Many motorcycles were returned rather than subjected to asset forfeiture based on a review of video to see if the person was directly involved in the violence.  So long as they took

10

cover, their property was returned.

45.     Landers took cover.  He did not so much as slap anyone at Twin Peaks, but he was arrested and indicted.

46.     The Defendants' decision to arbitrarily arrest Landers and others was not only without probable cause, but all of the information law enforcement had at the time of the arrest demonstrated that there was no criminal enterprise of engaging in organized crime at Twin Peaks on May 17th.

47.     Every bit of information gathered demonstrated that this was a political and social gathering with innocent people unwittingly at the scene of a violent conflagration created by a fraction of the attendees.  The objective video evidence contradicted the conclusion that Landers and others were engaging in organized crime.  The decision to arrest without probable cause was willful, intentional, and/or reckless.

*The warrant was unconstitutionally general.*

48.     Defendants caused an unconstitutionally general warrant to issue for the arrest of 177 people, most of whom were not involved in the violence.  The affidavits were identical for each of the 177 people, with a blank for the person's name to be hand-written.  The affidavit included A) patently false statements, and B) failed to set forth particularized facts against Landers that would establish probable cause for his arrest.  Any particular facts that were included were **false**.

49.     Chavez has admitted that he had no personal knowledge, and did not check the truthfulness, of any of the statements in the general warrants.  Further, he was given a list of names to insert in the affidavits, and he knew nothing about the individuals.  Chavez then swore to the 177 affidavits as a stack, rather than individually.

11

50.     He swore under oath that he had personal knowledge of the information contained in the affidavit, but he did not.  And, he swore to false statements in the affidavit, and then presented it to a magistrate.     Despite knowing that the affidavit was false, materially misleading, and unconstitutionally general, Chavez presented it to a magistrate to obtain a warrant to arrest Landers.

51.     The affidavit does not pretend to detail how, when, where, or with whom Landers or any others conspired to anything.  It fails to detail any criminal activity that Landers is supposed to have engaged in.  Instead of detailing what Landers did (take cover and stay alive), it states that Landers was at the scene.

52.     Yes, Landers was at the scene.  And, yet, Christian clubs were also present, were released and not charged, who engaged in the same conduct as Landers.  Members of Veterans clubs were present at the scene, did the same thing as Landers (take cover and stay alive), and they were released and not charged.

53.     The affidavit reads in pertinent part: "

My probable cause for said belief and accusation is as follows:

Three or more members and associates of the Cossacks Motorcycle Club (Cossacks) were in the parking lot of the Twin Peaks restaurant in Waco, McLennan County, Texas. Three or more members and associates of the Bandidos Motorcycle Club (Bandidos) arrived in the parking lot of the Twin Peaks restaurant and engaged in an altercation with the members and associates of the Cossacks.  During the course of the altercation, members and associates of the Cossacks and Bandidos brandished and used firearms, knives, or other unknown edged weapons, batons, clubs, brass knuckles, and other weapons.  The weapons were used to threaten and/or assault the opposing factions.  Cossacks and Bandidos discharged firearms at one another.  Members of the Waco Police Department attempted to stop the altercation and were fired upon by Bandidos and/or Cossacks.  Waco Police Officers returned fire, striking multiple gang members.  During the exchange of gunfire, nine persons were shot.  Nine people died as a result of the shooting between the members of the biker gangs.  Multiple other people were injured as a result of the altercation.  The members and associates of the Cossacks and Bandidos were wearing common identifying distinctive signs

12

or symbols and/or had an identifiable leadership and/or continuously or regularly associate in the commission of criminal activities.  The Texas Department of Public Safety maintains a database containing information identifying Cossacks and their associates as a criminal street gang and the Bandidos and their associates as a criminal street gang.

   After the altercation, the subject was apprehended at the scene, while wearing common identifying distinctive signs or symbols or had an identifiable leadership or continuously or regularly associate in the commission of criminal activities. […]

54.     Landers categorically denies that he "continuously or regularly associate[s] in the commission of criminal activities."

55.     No one, including Chavez, had reason to believe that statement.  It was made without regard for its truth.

56.     Consistent with this falsity, the affidavit includes the conclusory statement that Landers is a member of a criminal street gang.  He is not.  The club with which Landers was associated was not only **not** officially listed in a law enforcement database as a "criminal street gang," but was actually registered with the State of Texas as a limited liability corporation.

57.     Defendants each knew that the probable cause affidavit included false statements, and that such was presented to a magistrate to secure an arrest warrant for Landers and so many others.  They were each directly involved in the Twin Peaks investigation and were kept abreast of every development.  They knew or should have known that Landers was no criminal street gang member because no evidence existed to support the assertion, and neither Landers himself nor the Escondidos MC were named in any law enforcement database.

58.     Defendants each knew or should have known that Landers did nothing that can be construed as engaging in criminal conduct at Twin Peaks because of the objective video evidence.  The objective evidence, available at the time of the arrest, unequivocally demonstrates that Landers was

not even on the same side of the building where the conflagration occurred. The video proves that Landers was not involved. Defendants knew or should have known that Landers was not "regularly associated in the commission of criminal activities" since Landers held a CHL!

59.     Defendants' sole basis for arresting Landers was his clothing. Had his vest indicated he belonged to a Veterans club, he would have been released on the exact same facts. Had his vest indicated he belonged to a Clean and Sober club, he would have been released on the exact same facts.

60.     We know this is not mere unsupported syllogism because members of Christian and Veteran clubs who were near Landers when the violence erupted were released and not charged.

61.     Defendants punished Landers for his association with a club of which they had likely never heard, but had similar colors to a club about which they disapproved. The very fact that the government disapproves of a motorcycle club means that a person choosing to show affiliation is exercising his First Amendment rights.

62.     Nevertheless, Landers was not, and is not, a member of the Bandido Motorcycle Club or Cossack Motorcycle Club.

*$1,000,000 bonds compounded the damage done by the unconstitutional arrest.*

63.     Defendants were then instrumental in getting bail set at $1,000,000.00, just as it was for the other 177 people swept up in the mass arrest. As a result of the unconstitutional actions of Defendants, Landers was incarcerated and locked away from his wife for 21 days, lost his job, and contracted pneumonia.

64.     Defendants Stroman and Reyna then deliberately sought to poison public opinion and soil the

14

jury pool with false statements calculated to paint Landers and the other 177 people as gangsters. Specifically, the Waco Police Department created displays of guns and knives, including legally carried guns and legal knives, to make it appear as if every single person at the restaurant was engaged in an epic battle.  WPD omitted the truth that most of the guns were legally carried and not used, and most of the knives were legal, and not used.  Reyna made a statement to the media that everyone arrested was guilty: "if they're victims, then they shouldn't have any problem coming to law enforcement and cooperating… and, at least in the first round of interviews, we ain't getting that." This statement was false.  Most of the attendees cooperated with law enforcement, including Landers.

65.     Landers gave a voluntary statement to law enforcement on May 17th.

*Cookie-cutter indictments were returned, identical for more than 150 people.*

66.     Landers was indicted on November 10, 2015, as were 105 other people, for the offense of Engaging in Organized Criminal Activity with the Intent to Commit or Conspire to Commit Murder, Capital Murder, or Aggravated Assault.  The 106 indictments were identical to one another.

67.     The Grand Jury was tainted by Reyna and/or his agents by the introduction of inaccurate and false information.  They were misled by the presentment of materially misleading and false statements that claimed that Landers was a member of a criminal street gang, when he was not, and there was no factual basis for anyone to so conclude.

68.     Reyna has claimed that there is no grand jury transcript.  Chavez likely testified before the Grand Jury.  It is reasonable to conclude that Chavez testified consistent with his arrest affidavit. That affidavit was full of patently false information.

69.     Because there is simply no evidence that Landers was involved with or encouraged the violence at Twin Peaks, it is reasonable to conclude that Chavez tainted the Grand Jury deliberations by repeating false statements found in the affidavit.

70.     Chavez has testified in examining trials that all people wearing certain patches on their vests and clothing were members of criminal street gangs.  Chavez has also testified that he has no idea where that conclusion comes from.  It is a safe assumption that Chavez tainted the Grand Jury with the same false statements, the source of which he is unsure.

71.     Chavez swore in the probable cause affidavit that Landers was a member of a criminal street gang.  Landers is not a member of any criminal street gang.  It is reasonable to conclude that Chavez would have tainted the Grand Jury with this false statement.

72.     DPS Lt. Steven Schwartz likely testified in front of the Grand Jury.  He has testified at examining trials that people merely present at Twin Peaks were conspiring with those who committed violence solely by being present while wearing similar colors.  He has admitted that he had no direct evidence to support that conclusion.  The concept of conspiracy to commit violence by fashion is false, and is directly contradicted by the video evidence showing people fleeing away from the violence, wearing all manner of colors.  It is safe to assume that Schwartz tainted the Grand Jury with the false statement.

73.     Schwartz also stated that being present is a "show of force," even though there were no facts upon which any reasonable person could conclude that Landers was present to "show force."  It is likely that Schwartz tainted the Grand Jury with this false statement.

74.     The objective video evidence shows that everyone was surprised by the conflagration and

16

fled and/or took cover.  Reyna has stated that the Grand Jury met only on November 10, 2015 to consider the 106 indictments, and that every case presented was also indicted.

75.     Since then, Reyna has moved to continue trials, over Speedy Trial objections, arguing that the State needs a year to sort through evidence and provide potentially exculpatory material to those charged.  In a single workday, the Grand Jury reviewed 106 cases and returned indictments.  It is impossible that the Grand Jury was provided individualized and particular information for each of those cases, given the amount of time in a day, and the amount of time Reyna has stated he needs to work the cases.

76.     Further, the November 10th indictments included an allegation that a tenth man was killed at Twin Peaks – William Anderson.  Only nine people died at Twin Peaks on May 17th.  William Anderson left Twin Peaks alive (he was later killed in a crash in Nebraska).  The language of the indictment includes several "and/or" recitations.  In other words, the indictment lists each deceased person separated by "and/or."  Given the "and/or" language, technically the Grand Jury could have found probable cause to believe only William Anderson died at Twin Peaks.  If so, they were tainted with whatever information they were provided that pretended to show that William Anderson died there.

77.     Given that A) Chavez and Lt. Schwartz likely repeated the same false statements they had previously made in examining trials again to the Grand Jury, B) the short time allotted to return 106 indictments, and C) the inclusion of a living person as being among the dead, no reasonable person can say that a "neutral intermediary" considered particularized evidence regarding Landers prior to issuing a true bill of indictment.

17

78.    Instead, we can assume that the grand jury proceedings went exactly as the probable cause affidavits: There was a template with fill-in-the-blanks for the names, and the Grand Jury was told that merely wearing a piece of clothing nearby was enough to show that someone was conspiring to commit violence.  The Grand Jury was tainted with false statements conflating fashion with action. The false statements were material, and there is no way that the Grand Jury considered any real evidence particularly relating to Landers.

## Theories of Liability

79.    Plaintiff incorporates by reference all of the foregoing paragraphs, and asks that insofar as the following theories of liability include additional factual allegations, those allegations be taken as true, and further alleges as follows:

80.    Landers has a clearly established Constitutional right to associate with political groups of his choice, and to express his affiliation through clothing. *Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002) (wearing motorcycle club colors in a government building is First Amendment protected speech); *Piscottano v. Murphy*, 511 F.3d 247, 274 (2d Cir. 2007) (wearing clothing indicative of association with a motorcycle club of which law enforcement disapproves is First Amendment protected speech); *Healy v. James*, 408 U.S. 169, 185-86 (1972) ("the [Supreme] Court has consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization."). Defendants caused Landers to be arrested and charged with Engaging in Organized Criminal Activity solely for exercising his Constitutional right of association.  As a result, Landers has been subjected

to bond conditions that curtail his ability to communicate with various members of motorcycle clubs. As a lobbyist, who informs other motorcyclists about upcoming legislation, the bond conditions have infringed upon his First Amendment right to associate and politick. Defendants violated the First Amendment to the United States Constitution and 42 U.S.C. §1983.

81.     Landers has a clearly established Constitutional right to be present in a public place and speak on a matter of public concern. *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs."). He was exercising those co-equal rights on May 17, 2015, and Defendants caused him to be arrested and charged solely for being present. Defendants violated the First Amendment to the United States Constitution and 42 U.S.C. §1983.

82.     Landers has a clearly established Constitutional right to simply be present in a public place and loiter. *Chicago v. Morales*, 527 U.S. 41 (1999). Defendants unconstitutionally caused Landers to be arrested and charged with Engaging in Organized Criminal Activity, despite the demonstrable lack of probable cause. Defendants violated the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

83.     Landers has a clearly established Constitutional right to be free from unlawful arrest. Defendants unconstitutionally caused Landers to be arrested and charged with Engaging in Organized Criminal Activity, despite the demonstrable absence of probable cause that Landers committed a crime. Defendants unlawfully deprived Landers of his right to be secure in his person against unreasonable seizure in violation of the Fourth Amendment of the Constitution of the United

19

States and 42 U.S.C. §1983.

84.      Landers has a clearly established Constitutional right to not be arrested except for on the showing of probable cause that is particularized to him. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Police officers are not entitled to qualified immunity when they submit a warrant application that so lacks indicia of probable cause as to render official belief in its existence unreasonable. *Malley v. Briggs*, 475 U.S. 335, 345 (1986). Defendants caused Landers to be arrested by knowingly and intentionally, or with reckless disregard for the truth, creating a facially deficient affidavit in support of the arrest warrant, that utterly lacks facts that would support probable cause to arrest Landers. Defendants violated his Constitutional rights when they caused the affidavit to be created and when they presented it to a Magistrate.

85.      Alternatively, and without waiving the arguments above, Defendants violated Landers' Fourth Amendment rights by intentionally and knowingly, or with reckless disregard for the truth causing the affidavit to include materially false and misleading statements, without which there was no probable cause for Landers's arrest. *See Franks v. Delaware*, 438 U.S. 154 (1978); *and Hale v. Fish*, 899 F.2d 390, 400 n.3 (5th Cir. 1990).

86.      The following false statements were included in the affidavit: A) Landers is a member of a criminal street gang, B) who 'regularly associates in the commission of criminal activities.' Defendants caused the affidavit to be created and presented to a magistrate including false statements, in the face of objective evidence that Landers's conduct was law abiding on May 17, 2015.  Defendants knowingly and intentionally, or with reckless disregard for the truth, promoted these false statements.  The clearly established Constitutional right to suppression upon a showing of

20

a *Franks* violation precludes qualified immunity in this situation.

87.     Landers has a clearly established Constitutional right to be free from law enforcement fabricating evidence, pursuant to the Fourteenth Amendment to the United States Constitution. Defendants violated that Constitutional right by creating and promoting falsehoods in the affidavit in support of the arrest warrant. *Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015).

*Defendants conspired to violate Landers's civil rights.*

88.     Defendants entered into a conspiracy to deprive Landers of his right to associate, be present in a public place, and be free from unlawful seizure in violation of the First and Fourth Amendments to the United States Constitution.  Defendants acted in concert either to orchestrate or to carry out the illegal seizure and cause the illegal arrest and incarceration described above when Defendants knew there was no probable cause to arrest Landers or charge him with the offense of Engaging in Organized Criminal Activity.

89.     Defendants conspired to cause a warrant to be issued for Landers's arrest based on a false or deficient probable cause affidavit that Defendants knew to be false and/or deficient.

90.     Defendants Stroman and Reyna knew that Chavez was swearing to false statements for the purpose of obtaining arrest warrants and they did nothing to stop him.

91.     The conspiracy involved state action, as Defendants acted under color of the statutes, customs, ordinances, and usage of the State of Texas.

92.     As a direct result of Defendants' illegal conduct, Landers was deprived of his constitutional rights, all to his damage.

*Reyna is not entitled to immunity, as he hijacked law enforcement's role.*

93.     Reyna is not entitled to immunity because he took the following actions that were not those

of a prosecutor, but those of an investigator: A) He and his agents arrived at the scene within hours

after the violence and took pictures, reviewed information as it became known, B) gathered facts to

purportedly establish probable cause, and C) inserted himself into the investigative phase of the case,

completely redirecting the course of law enforcement's established investigation and plan of release.


94.     Actually, it can be said that Reyna entirely took over the investigative phase of the case by

preventing law enforcement from releasing innocent people and requiring their arrests for being

associated with clubs with similar colors as Bandidos or Cossacks.

95.     Chavez has admitted that the facts included in the probable cause affidavit he signed came

from the district attorney's office.

96.     Reyna made the decision to arrest everyone at the scene based on what they were wearing.

97.     Reyna altered law enforcement's existing plan to interview the attendees and release them.

He altered the course of the investigation from Who-Did-What to What-Are-They-Wearing.

98.     Reyna and Stroman decided together to make the mass arrest when the assistant chiefs on the

scene disagreed with that decision.  Stroman acquiesced to Reyna's decision without being present at

the scene, and despite his assistant chiefs' expressed disapproval of the mass arrests.


**Damages**

99.     Plaintiff suffered loss of property, mental anguish, health and emotional injuries, pain and

suffering, lost wages, lost business potential, embarrassment, humiliation, shame, indignity, damages

22

to reputation, and special damages incurred or will incur, including but not limited to past present and future lost wages, legal fees, legal expenses, and other related expenses.  Just as he was arrested and charged for exercising his co-equal First Amendment rights to associate, be present in a public place, and speak on a matter of public concern, Landers remains subject to bond conditions that curtail his ability to lobby and inform members of motorcycle clubs about legislation affecting their rights and safety.

### Punitive Damages

100.    All individuals sued are liable for punitive damages as they were consciously indifferent to Plaintiff's constitutional rights.

### Demand for Jury Trial

101.    Plaintiff respectfully requests a jury trial.

### Relief

In light of the foregoing, Plaintiff requests Judgment against Defendants, jointly and severally as follows:

1.    Compensatory damages from the Defendants, in an amount to be determined by the trier of fact;

2.    Punitive damages from the Defendants, in an amount to be determined by the trier of fact;

3.    Pre-judgment and post-judgment interest;

4.  Reasonable costs, expenses, and attorney's fees pursuant to 42 U.S.C §1988(b), expert fees

    pursuant to 42 U.S.C. §1988(c); and

5.  All such other relief to which Plaintiff is entitled.

<div style="margin-left: 40%;">

Respectfully Submitted,
PLAINTIFF

By:
/s/ Millie L. Thompson
Millie L. Thompson
Texas State Bar Number:  24067974
*The Law Office of Millie L. Thompson*
401 Congress Ave., Ste. 1540
Austin, Texas 78701
Telephone: (512) 293-5800
Fax: (512) 682-8721
Email: millieaustinlaw@gmail.com

</div>

24